**Pamela Y. MILLER, Plaintiff,**

v.

**CITY OF COLUMBUS,
et al., Defendants.**

No. C2–94–1267.

United States District Court,
S.D. Ohio,
Eastern Division.

March 28, 1996.

Michael S. Kolman, Spater, Gittes, Schulte & Kolman, Columbus, OH, for plaintiff.

Nancy L. Weidman, Assistant City Attorney, Columbus, OH, for defendants.

## OPINION AND ORDER

GRAHAM, District Judge.

Plaintiff, Pamela Y. Miller, brings this action under 42 U.S.C. §§ 1983 and 1985 asserting that the defendants, City of Columbus, Ohio (hereinafter referred to as "City") and Thomas E. Miller and Jeffrey Mathys, Columbus Police officers, violated her rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution. Plaintiff also asserts state law claims of negligence and intentional and negligent infliction of emotional distress. Plaintiff brings this suit against defendants in their official and individual capacities. This matter is now

before the Court on defendants' motion for summary judgment.

The plaintiff, who is black, is a resident of the City and lives in a predominately black neighborhood. The defendants Mathys and Miller are employed by the City as police officers in its Division of Police. On the night of January 2, 1993, plaintiff Miller called the Division of Police, through its 911 system, and reported that William Revels had broken into her residence. Defendants Mathys and Miller were dispatched to plaintiff Miller's residence. The events that followed defendants' dispatch to plaintiff's residence are disputed by the parties.

The defendants proffer the deposition testimony of defendants Mathys and Miller. They testified that they were dispatched to plaintiff's residence and advised by the dispatcher that a domestic disturbance was occurring there involving the plaintiff's "boyfriend." (Miller Depo. p. 9; Mathys Depo. p. 11) (Defendants' Exhibit 1a). Defendant Mathys stated that when he and Miller arrived at plaintiff's residence, they were met at the door by Revels. (Mathys Depo., p. 11). When they entered the residence, plaintiff immediately came downstairs. She was upset and stated that she did not know Revels and that he had broken into her home.[1] (Miller Depo., pp. 12 and 13). Plaintiff and Revels then began "screaming and hollering" at each other. After attempting to control the situation, the defendants questioned Revels and he informed them that he lived there and that he had clothes and mail in the upstairs bedroom. (Miller, Depo., p. 14). The defendants, plaintiff Miller and Revels then proceeded to the plaintiff's bedroom. (Miller, Depo., p. 14).

Upon entering the bedroom, Revels showed defendants mail addressed to him reflecting the plaintiff's address. (Mathys, Depo., p. 15).[2] Revels also opened several dresser drawers and identified certain clothing items as belonging to him. Plaintiff Miller disagreed and stated that the clothing belonged to her husband. (Miller Depo., p. 18). The defendants then decided to separate plaintiff Miller and Revels. Mathys took plaintiff downstairs to the kitchen while defendant Miller stayed upstairs with Revels. (Miller Depo., p. 19). While downstairs, plaintiff showed Mathys the side door which had been "kicked in" and stated that she knew Revels and that he had lived with her for approximately two weeks. She further stated that the clothing identified by Revels belonged to her husband who was in prison. (Mathys Depo., pp. 19–20). Meanwhile defendant Miller and Revels were upstairs in the bedroom. Plaintiff's daughters, who were standing near the bedroom, informed defendant Miller that Revels lived there. Defendant Miller then requested that Revels leave the plaintiff's residence and told him to "get a bag and.... take your clothes with you." (Miller Depo., p. 21). Defendant Miller stated that he saw Revels place "some pants and shirts, underwear [and].... a jacket" into a green trash bag. (Miller Depo., p. 22). As Revels packed the clothing items, he attempted to claim a boxed set of screwdrivers and a ring, but plaintiff's children disagreed. Defendant Miller prevented Revels from removing those items. At no time did the plaintiff's daughters indicate that Revels was removing their mother's property.

Once Revels packed the clothing into the bag, Miller escorted Revels downstairs and out of the plaintiff's residence. (Miller Depo., pp. 22–25). Miller testified that as he escorted Revels out of the residence neither he, nor plaintiff, asked to inspect the bag. (Miller Depo., p. 25). He further testified that while he and Mathys were there, plaintiff Miller did not complain at any time that Revels had taken her property. (Miller Depo., pp. 27 & 35). Mathys, however, testified that plaintiff Miller asked to inspect the bag after Revels departed from her residence. (Mathys Depo., p. 23).

Plaintiff Miller disputes the deposition testimony of defendants Mathys and Miller. In

---

1. Defendants Mathys states that when he and Miller entered the residence, the plaintiff, who was at the top of the stairwell, screamed, "He robbed me, he robbed me. Officer arrest him. He robbed me." (Mathys Depo. p. 13).

2. Defendant Miller testified that he did not recall seeing any mail addressed to Revels at plaintiff's residence. (Depo. p. 18).

her deposition testimony, plaintiff stated that she became acquainted with Revels while he was in prison. They communicated with each other by telephone and correspondence. (Pamela Miller, Depo., pp. 12–13). On the evening of January 2, 1993, she was at home with her daughters and their friend when Revels stopped by her residence to visit. Although she did not wish to see him, plaintiff's daughter permitted Revels to enter the residence. Plaintiff and Revels talked and then Revels departed for the grocery store. When he returned, plaintiff refused to allow him to re-enter the residence. (P. Miller, Depo., pp. 16–19). After Revels became violent, plaintiff called the police and told the dispatcher "[t]here is a man outside screaming and yelling, saying he is getting ready to break our windows out to our house." (P. Miller, Depo., p. 20). Revels broke into the residence through the side door and plaintiff and her daughters fled upstairs to a bedroom. (P. Miller Depo., pp. 20–22).

Defendant Mathys and Miller then arrived at the residence and were met by Revels. Plaintiff came downstairs and informed defendants that Revels was a robber, that he damaged her side door, and that she wanted him removed. (P. Miller, Depo., pp. 24–25). Plaintiff, defendants and Revels next proceeded upstairs to plaintiff's bedroom. While in the bedroom, plaintiff disputed Revels' claims that he lived there and that he had clothing in a nearby dresser. Plaintiff Miller and defendant Mathys then proceeded downstairs where plaintiff showed Mathys the doors damaged by Revels. (P. Miller, Depo., p. 31). After viewing the doors, defendant Mathys refused to do anything and told plaintiff that it was a domestic matter. (P. Miller, Depo., p. 32). Revels then immediately ran upstairs. When he returned downstairs with a green trash bag, plaintiff requested the opportunity to look into the bag but was told by one of the officers that the items belonged to Revels. (P. Miller, Depo., p. 33). She informed the defendants that Revels had nothing in the house. As Revels and defendants approached the front door to leave, she made another request to look into the bag. She then attempted to force her way through the front door to grab the bag as Revels exited through the door,

but one of defendants stood in front of her. That defendant then told plaintiff that the dispute was a civil matter and that it should be resolved in court. (Pamela Miller Depo., pp. 33–34).

The plaintiff also proffers the affidavit of her daughter, Ebony Crosby, who is eighteen years of age. (Plaintiff's Exhibit D). Ms. Crosby states that the officer who followed Revels upstairs was not in the bedroom as Revels packed the trash bag. He was standing on the staircase landing. She also states that although plaintiff informed defendants that Revels was taking her things, they would not allow anyone to look inside the bag. (Crosby Affidavit, para. 12) (Doc. # 17).

That same evening, plaintiff called 911 again and reported that Revels had stolen two cellular phones, several leather coats, clothing, jewelry and money. The Division of Police dispatched a third officer to the residence who took a report. The record indicates that Revels was later arrested and charged with aggravated burglary in connection with the alleged theft of Miller's property and ultimately plead guilty to a lesser burglary offense.

▪ ▆▆▆ Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir.1993); *Osborn v. Ashland County Bd. of Alcohol, Drug Addiction and Mental Health Servs.*, 979 F.2d 1131, 1133 (6th Cir.1992) (per curiam). The party that moves for summary judgment has the burden of showing that there are no genuine issues of material fact in the case at issue, *LaPointe*, 8 F.3d at 378, which may be accomplished by pointing out to the court that the nonmoving party lacks evidence to support an essential element of its case. *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1389 (6th Cir.1993). In response, the nonmoving party must present "significant probative evidence" to demon-

strate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir.1993). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). *See generally Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989).

■ In reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir.1993) (quoting *Anderson*, 477 U.S. at 251–53, 106 S.Ct. at 2511–12). The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512; *see Gregory v. Hunt*, 24 F.3d 781, 784 (6th Cir.1994). Finally, a district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Adams v. Metiva*, 31 F.3d 375, 378 (6th Cir.1994).

## I. *LIABILITY OF THE CITY AND THE DEFENDANT OFFICERS IN THEIR OFFICIAL CAPACITY UNDER SECTION 1983*

The defendants move for summary judgment on the ground that liability under 42 U.S.C. § 1983 may only be imposed upon a city where a constitutional deprivation occurs pursuant to an official policy, custom or practice. They argue that the City's policy in the instant case was to promote and protect the constitutional rights of all persons. Plaintiff contends that the City maintains a policy concerning property involved in a domestic dispute and that defendant officers, acting pursuant to such a policy, caused the theft of her property.

■ A municipality is liable under section 1983 only if the municipality itself caused the constitutional deprivation. *Monell v. Department of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A governmental body is not liable under section 1983 for an injury inflicted solely by its employees or agents, and the doctrine of respondeat superior is inapplicable to section 1983 actions. *Id.* at 691–95, 98 S.Ct. at 2036–38. A municipality is liable only where the violation of constitutional rights stems from a governmental policy or custom. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The local government's policy or custom "must be 'the moving force of the constitutional violation' in order to establish the liability of a government body under § 1983." *Polk County v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981) (quoting *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037). Under *Monell*, actions for damages against a party in his official capacity are in essence actions against the governmental entity. 436 U.S. at 690 n. 55, 98 S.Ct. at 2035 n. 55. Damages may be awarded against a defendant in his official capacity only if they are available against the governmental entity itself. *Kentucky v. Graham*, 473 U.S. 159, 165–66, 105 S.Ct. 3099, 3104–05, 87 L.Ed.2d 114 (1985).

■ In order to satisfy the requirements established in *Monell*, a plaintiff must "'identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy.'" *Garner v. Memphis Police Department*, 8 F.3d 358, 364 (6th Cir.1993) (quoting *Coogan v. City of Wixom*, 820 F.2d 170, 176 (6th Cir.1987)).

■ The defendants proffer the affidavit of James G. Jackson who serves as Chief of the City's Division of Police. Jackson states

that the Division conducts its business in accordance with federal and state law and its directives. He also states that the Division has "no official policy, custom or practice of permitting individuals involved in a domestic dispute to remove property, whose ownership is contested, from a residence." (Defendants' Motion for Summary Judgment, Exhibit 5). In addition, defendants offer the Division's Mission Statement and its policy directives which show that the Division's personnel must comply with federal and state law. (Defendants' Motion for Summary Judgment, Exhibits 5A–C).

Plaintiff offers the deposition testimony of Vernon C. Chenevey, Jeffrey Mathias and defendants Mathys and Miller as evidence of an official policy or custom permitting individuals involved in a domestic dispute who claim property to remove that property from a residence without a court order. Chenevey, who is currently Commander of the Division of Police's communications bureau, served as Commander of the Division's training academy from January, 1990 to May, 1994. As Commander, Chenevey was responsible for general supervision of the academy. (Chenevey Depo., pp. 4–5). Mathias, a Sergeant with the Division of Police, investigated plaintiff's complaint concerning the incident at her residence on January 2, 1993. (Mathias Depo., pp. 5–10). Their testimony indicates that the Division of Police maintains an unwritten policy that requires police officers dispatched to a domestic dispute to 1) separate the parties and prevent the removal of common or jointly owned property, 2) advise the parties that they must resolve their dispute over common property through the civil process and 3) if one of the parties desires to leave the residence that party is allowed to take personal items such as a coat or jacket to "tide them over for a night or two." (Chenevey Depo., p. 9) (Mathias Depo., p. 12–13). As police academy trainees, defendants Mathys and Miller were taught this policy during Chenevey's tenure as commander. (Chenevey Depo., pp. 4–5). Defendant Miller testified that his understanding of the policy was that if one of the parties leaves the residence, they are permitted to take personal clothing and toiletries. (Miller Depo., 31). In his deposition, Mathys

testified that he received the following training:

Q. Have you received any training as to what you do when there's a dispute over personal property in someone's residence?

A. Just during coaching.

Q. And what were you taught during coaching?

A. Basically what we were taught was if it's obvious it belongs to one or the other, then they can take it. If there is a dispute over where it could belong to either party, then it stays in the residence and you have to file some kind of civil action to get that property.

(Mathys Depo., p. 37).

The record shows that the City maintains an unwritten policy or custom concerning property involved in a domestic dispute and that such policy is taught to police trainees through its training program at the police academy. The policy provides that common or jointly owned property may not be removed from the residence and that a party leaving the residence is only permitted to remove personal items such as clothing or toiletries. Where there is a dispute over personal property that could belong to either party, that property should remain in the residence. This policy is not unconstitutional on its face. The record however indicates that defendants Mathys and Miller may have deviated from this policy.

The items allegedly removed from plaintiff's residence by Revels cannot be characterized as clothing or toiletries. The items allegedly stolen included cellular phones and $1,700 in cash, things which are not necessary to "tide [a person].... over for a night or two." Assuming the evidence presented by plaintiff is true, the defendants' actions in permitting Revels to remove the property and their failure to inspect or allow the plaintiff to inspect the bag to determine its contents would be inconsistent with the policy where the ownership of the property is being contested. Plaintiff has failed to show that the theft of her property was incurred because of the execution of the Division of Police's policy or custom.

■ The Court further concludes that there is no evidence that the City had a custom or policy of inadequate training or supervision which resulted in a violation of plaintiff's constitutional rights. The plaintiff has not produced any evidence that the training program was inadequate, or that the alleged failure to train resulted from the City's deliberate indifference, both of which are required for a failure to train to be actionable. *Searcy v. City of Dayton,* 38 F.3d 282, 287 (6th Cir.1994). Nor is there any evidence that the City maintained a policy of deliberate indifference in failing to adequately supervise the defendants. Accordingly, the defendants' motion for summary judgment as to the defendant City of Columbus is well taken.

## II. LIABILITY OF THE DEFENDANT OFFICERS IN THEIR PERSONAL CAPACITY

■ In order to prevail under 42 U.S.C. § 1983, the plaintiff must prove that a person acting under color of state law has deprived the plaintiff of a right secured by the Constitution or other federal laws. *Foy v. City of Berea,* 58 F.3d 227 (6th Cir.1995). Assuming the allegations presented by plaintiff are true, the defendants' actions would constitute state action. E.g. *Soldal v. Cook County, Ill,* 506 U.S. 56, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992); *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).

■ "Section 1983 alone creates no substantive rights; rather it provides a remedy for deprivations of rights established elsewhere in the Constitution or federal laws." *Cornelius v. Town of Highland Lake, Ala.,* 880 F.2d 348 (11th Cir.1989). "The

first step in any such claim is to identify the specific constitutional right allegedly infringed." *Albright v. Oliver,* 510 U.S. 266, ——, 114 S.Ct. 807, 811, 127 L.Ed.2d 114 (1994).

### (a) Due Process

The defendants assert that they are entitled to summary judgment on plaintiff's claim that defendants deprived plaintiff of her property interests without due process and failed to protect her from unjustified intrusions upon her personal security protected by the Fourteenth Amendment to the Federal Constitution.

■ The specific guarantees of the first Eight Amendments to the United States Constitution prescribe limits to the exercise of government authority in particular situations. *Armendariz v. Penman,* 75 F.3d 1311 (9th Cir.1996). "Where a particular amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.' " *Albright,* 510 U.S. at ——, 114 S.Ct. at 813 (quoting *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989)).[3]

In *Graham,* the petitioner claimed that the police used excessive physical force against him during the course of an investigatory stop, in violation of his rights under the Fourteenth Amendment. The Court reasoned that the Fourth Amendment's prohibition against unreasonable seizures or the Eighth Amendment's ban on cruel and unusual punishment were the two primary sources of constitutional protection against physically abusive governmental conduct. Where an excessive force claim arises in the

---

**3.** In *Soldal,* the Supreme Court stated: "[c]ertain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands. Where such multiple violations are alleged, we are not in the habit of identifying as a preliminary matter the claim's 'dominant' character. Rather, we examine each constitutional provision in turn." 506 U.S. at 70, 113 S.Ct. at 548. The Court went on to state, however, in referring to *Graham:* "We were guided by the fact that, in that case, both provisions targeted the same sort of governmental conduct and, as a result, we chose the more

'explicit textual source of constitutional protection' over the 'more generalized notion of "substantive due process." ' " *Id.* After the *Graham* decision, the Court, in a plurality opinion, reaffirmed the reasoning employed in that decision. *See Albright v. Oliver,* 510 U.S. at ——, 114 S.Ct. at 813. In addition, the Seventh, Ninth and Eleventh Circuits have applied *Graham* and held that substantive due process claims were preempted by the Fourth Amendment. *Kernats v. O'Sullivan,* 35 F.3d 1171 (7th Cir.1994); *Armendariz v. Penman, supra; Tinney v. Shores,* 77 F.3d 378 (11th Cir.1996).

context of an arrest or investigatory stop of a free citizen, that claim should be analyzed under the Fourth Amendment, which guarantees a citizen's rights to be secure in his or her person against unreasonable seizures, not the more generalized notion of substantive due process. 490 U.S. at 394–395, 109 S.Ct. at 1870–71. The Supreme Court reaffirmed the reasoning in *Graham* in a subsequent decision, *Albright v. Oliver, supra.* There, the petitioner argued that respondent, who had initiated a criminal prosecution against him, infringed upon his substantive right under the Due Process Clause to be free from criminal prosecution except upon probable cause. The Court found that the "Framers considered the matter of pretrial deprivations of liberty, and drafted the Fourth Amendment to address it." 510 U.S. at ——, 114 S.Ct. at 813. Finding that the Fourth Amendment provided the appropriate standard to analyze the petitioner's claims, the Court concluded that substantive due process could afford petitioner no relief.

In the instant case, the plaintiff argues that her substantive due process rights were infringed upon by defendants who allegedly facilitated the removal of her property from her residence.

 The Fourth Amendment, made applicable to the States by the Fourteenth Amendment, protects not only criminal suspects but also limits governmental intrusions in civil contexts. *Flatford v. City of Monroe,* 17 F.3d 162, 169 (6th Cir.1994). The text of the Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and person or things to be seized.

The text of this Amendment directly applies to the factual circumstances in the instant case. The relevant portion of this Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." This

Amendment protects property interests as well as expectations of privacy. *Armendariz,* 75 F.3d at 1320. "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). Indeed, the right against unreasonable seizure of property would be "no less transgressed if the seizure . . . . was undertaken to collect evidence, verify compliance with a housing regulation, effect an eviction by the police, or on a whim, for no reason at all." *Soldal,* 506 U.S. at 69, 113 S.Ct. at 547. Plaintiff has presented evidence that Revels removed property belonging to her from her residence. The defendants were dispatched to plaintiff's residence to investigate a domestic dispute. Assuming the allegations presented by plaintiff are true, the defendants' denial of plaintiff's request to inspect the trash bag and their restraint of her as she attempted to prevent the removal of the property would constitute "meaningful interference with her possessory interests in the property." Since the Fourth Amendment provides an explicit textual source for the government conduct being challenged by plaintiff, this Court, like the courts in *Graham* and *Albright,* finds that this Amendment should guide its analysis in this case.

Assuming *arguendo* that plaintiff's substantive due process claim is not preempted under *Graham* and *Albright,* the Court nevertheless finds that plaintiff has failed to establish such a claim. The Due Process Clause is contained in the Fourteenth Amendment to the United States Constitution. It declares that no State shall "deprive any person of life, liberty, or property, without due process of law." The Clause applies to substantive and procedural matters. *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). As a general matter, the United States Supreme Court has "always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights,*

*Tex.,* 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992). The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity. *Albright,* 510 U.S. at ——, 114 S.Ct. at 812.

■■■■ In *LRL Properties v. Portage Metro Housing Authority,* 55 F.3d 1097, 1111 (6th Cir.1995), this Circuit explained that there are two types of substantive due process claims:

> Substantive due process claims are of two types. The first type includes claims asserting denial of a right, privilege, or immunity secured by the Constitution or by federal statute other than procedural claims under 'the Fourteenth Amendment simpliciter.' The other type of claim is directed at official acts which may not occur regardless of the procedural safeguards accompanying them. The test for substantive due process claims of this type is whether the conduct complained of 'shocks the conscience' of the court.

Analyzing plaintiff's claim under the first category, the Court finds that plaintiff has failed to establish a violation of her substantive due process rights. Since the evidence in the record suggests that defendants did not follow any of the City's policies or practices, their actions cannot be characterized as authorized by the City or state law. In *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), overruled in part on other grounds, *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), the Supreme Court held that where there has been an unauthorized deprivation of property without due process, a plaintiff bringing a section 1983 claim must allege that the state postdeprivation procedures are inadequate to remedy the deprivation. *See also Hudson v. Palmer,* 468 U.S. 517, 531, 104 S.Ct. 3194, 3202, 82 L.Ed.2d 393 (1984)

(unauthorized intentional deprivation of property by a state employee does not constitute a violation of the Due Process Clause if a meaningful post-deprivation remedy for the loss is available). The holding in *Parratt* would also apply to substantive due process claims. *See Weimer v. Amen,* 870 F.2d 1400 (8th Cir.1989) ("[i]n situations where procedural due process claims alleging property deprivation are prohibited in section 1983 actions by *Parratt,* claims based on the same actions but alleging denial of substantive due process should be barred as well"); *See also United of Omaha Life Ins. Co. v. Solomon,* 960 F.2d 31, 35 (6th Cir.1992) (*Parratt* extended to substantive due process claim where adequate postdeprivation remedy existed under Michigan law.); *Archuleta v. Colorado Department of Institutions,* 936 F.2d 483, 491 (10th Cir.1991) ("Although the *Parratt* case did not specifically address the issue of substantive due process, the Court's conclusion that the available remedy was adequate to satisfy the requirements of due process is significant. We believe the same principle would apply here, where the plaintiff has been fully compensated for the property loss she suffered ..."); *Kauth v. Hartford Ins. Co. of Illinois,* 852 F.2d 951, 957 (7th Cir.1988) (no substantive due process claim stated when state created property interest at stake and state remedies are available).[4] Allowing a substantive due process claim for deprivation of property where an adequate state remedy exists would effectively eviscerate the holding of *Parratt. Schaper v. City of Huntsville,* 813 F.2d 709, 718 (5th Cir.1987).[5] In section 1983 damage suits claiming the deprivation of a property interest without due process, the plaintiff must plead and prove that state remedies for redressing the wrong are inadequate. *Vicory v. Walton,* 721 F.2d 1062 (6th Cir.1983), *cert. denied* 469 U.S. 834, 105 S.Ct. 125, 83 L.Ed.2d 67 (1984); *Wells v. Brown,* 891 F.2d

---

4. Other Circuits have disagreed with the application of *Parratt* to substantive due process claims. *See Wood v. Ostrander,* 879 F.2d 583 (9th Cir. 1988); *Robison v. Via,* 821 F.2d 913 (2nd Cir. 1987). This Court, however, disagrees with the reasoning of these courts for the reasons stated above.

5. The Court notes that a panel of the Fifth Circuit in *Davis v. Bayless,* 70 F.3d 367 (5th Cir.1995), stated that the *Parratt* doctrine could only be applied to procedural due process claims. The court in *Davis* did not mention the *Schaper* decision. Accordingly, this Court expresses doubt concerning the effect of *Davis* on the Fifth Circuit's decision in *Schaper.*

591, 592 n. 1 (6th Cir.1989). The plaintiff has failed to plead or otherwise argue that the remedies afforded under Ohio law are inadequate.

 In regard to the second category of substantive due process claims, the Court finds that the alleged deprivation of property in this case does not rise to the level of "shocks the conscience." Indeed, this Court believes that interference with a property interest could never rise to that level. *Mansfield Apartment Owners Ass'n v. City of Mansfield,* 988 F.2d 1469, 1478 (6th Cir. 1993) ("shocks the conscience" standard only applies to physical abuse).

The record indicates that neither plaintiff's liberty nor her bodily integrity was threatened by the defendants' actions. Assuming the allegations made by plaintiff are true, the plaintiff was free to leave the residence at any time. The defendants did not create any threat to plaintiff's bodily integrity, to the contrary, their presence appears to have had the opposite effect.[6]

Plaintiff, relying on *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), argues that defendants' participation in the removal of her property violated her substantive due process rights. In *DeShaney,* the petitioner's liberty interest in bodily integrity was implicated because the state failed to protect him from his father's violence. The Court held that the state's failure to act had not deprived the petitioner of his liberty interest in violation of the Due Process Clause. The Court reasoned that, although the Due Process Clause protects individuals against unlawful governmental interference with the right to life, liberty and property, it does not impose upon the state an affirmative duty to protect its citizens or their property from private actors. *Id.* at 195, 109 S.Ct. at 1002.

Plaintiff cites the following statement from *DeShaney* in support of her argument that defendants had a duty to protect her property:

In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

*Id.* at 200, 109 S.Ct. at 1005. She argues that the "other similar restraint" language in *DeShaney* extends to this case because the defendants restrained or otherwise prevented her from protecting herself or her property. Relying on *Walton v. City of Southfield,* 995 F.2d 1331 (6th Cir.1993), the plaintiff argues that the "other similar restraint" language in *DeShaney* is not limited to conditions of incarceration, but would also apply to the non-incarceration context. In *Walton* the court relied on *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), wherein the Supreme Court held that while in school, junior high school students had a protected liberty interest in personal security. In both *Ingraham* and *Walton,* the plaintiff's liberty interest in personal security was implicated. *Id.* No such interest was implicated in the instant case.

As noted above, the Supreme Court has expressed reluctance in expanding the concept of substantive due process. *Collins,* 503 U.S. at 125, 112 S.Ct. at 1068. The cases relied upon by the *DeShaney* court stood for the proposition that where the "State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." 489 U.S. at 200, 109 S.Ct. at 1005. Defendants did not place plaintiff Miller into custody nor was her safety and general well-being threatened by their conduct. The defendants' alleged conduct resulted only in a deprivation of property. This Court concludes that the reasoning in *DeShaney* should not be extended to plaintiff's substantive due process claim.

---

**6.** The record indicates that Revels damaged the plaintiff's side door and threatened her prior to the arrival of defendants. Defendants intervention clearly led to removal of Revels from the plaintiff's residence.

**820**

## (b) Fourth Amendment

Alternatively, the plaintiff has asserted that her Fourth Amendment rights were violated. Relying principally upon *Soldal v. Cook County, Ill., supra,* plaintiff argues that the defendants' actions constituted an unlawful seizure of plaintiff's property in violation of her rights under this Amendment.

In *Soldal,* a trailer home owned by the plaintiffs was forcibly removed by the owner and manager of a mobile home park. The owner, who had filed an eviction proceeding against the plaintiffs in state court, forcibly removed the plaintiffs' trailer before a judgment of eviction was entered. Three deputy sheriffs of the Cook County Sheriff's office were present, at the request of the owner, to prevent the plaintiffs from interfering with the removal. During the removal, a deputy sheriff informed the plaintiffs that they were present to prevent the plaintiffs from interfering with the removal of the trailer. Plaintiffs attempted to file a criminal complaint against the owner but were precluded from doing so by deputy sheriffs at the scene. The deputy sheriffs were aware that the owner did not have an eviction order and that its actions were unlawful.

The sole issue before the Supreme Court in *Soldal* concerned whether the seizure and removal of the petitioners' trailer home implicated their Fourth Amendment rights. *Id.* at 60, 113 S.Ct. at 542. The Court did not decide the issue of whether the seizure of the trailer home constituted a violation of this Amendment. This issue, the Court stated, was a "different question that requires determining if the seizure was reasonable.... [t]hat inquiry entails the weighing of various factors and is not before us." *Id.* at 62, 113 S.Ct. at 543. With respect to the issue of whether petitioner's Fourth Amendment rights were implicated, the Court held that the removal of the trailer constituted a "seizure" under the Fourth Amendment. It reasoned that the Fourth Amendment protects property as well as privacy and that a " 'seizure' of property.... occurs when there is some meaningful interference with an individual's possessory interests in that property." *Id.* at 61–63, 113 S.Ct. at 543–44. In regard to the second issue, the Court went

on to state that " 'reasonableness' is.... the ultimate standard under the Fourth Amendment." *Id.* at 71, 113 S.Ct. at 548. The determination of reasonableness requires a court to carefully balance governmental and private interests. *Id.* The Court noted that a showing of unreasonableness would be difficult in the situation where a police officer acted pursuant to a court order. *Id.*

The Sixth Circuit has applied the reasoning in *Soldal* in a case where a person's property was damaged during the execution of a search warrant. *Bonds v. Cox,* 20 F.3d 697 (6th Cir.1994). There, the court found that damage to the plaintiff's house, which included broken doors, mutilated vinyl siding, and holes in walls, among other things, clearly rose to the level of "meaningful interference" with the plaintiff's possessory interests. *Id.* at 702. The court thus concluded that the plaintiff's Fourth Amendment rights had been implicated. As noted above, the determination of whether a person's Fourth Amendment rights are implicated does not end a court's inquiry. A court must also analyze the state actor's conduct to determine if that conduct was reasonable. *Soldal* provides that where a police officer acts pursuant to a court order his or her conduct is presumably reasonable. In *Haverstick Enterprises, Inc. v. Financial Federal Credit, Inc.,* 32 F.3d 989 (6th Cir.1994), the court found that a police officer who questioned a plaintiff for five minutes during the repossession of plaintiff's truck did not violate that person's rights under the Fourth Amendment. The court reasoned that the police officer's conduct was objectively reasonable because he had detained the plaintiff to gather information for a report only. *Id.* at 996.

In the instant case, viewing the evidence in a light most favorable to plaintiff, the record indicates that the defendants may have facilitated the "seizure" of plaintiff's property. The deputy sheriffs in *Soldal* informed the plaintiffs that they were present to prevent their interference with the removal of the trailer home. While the deputy sheriffs did not physically remove the property themselves, they did facilitate its "seizure" by preventing the plaintiffs from

interfering with the removal of the trailer. Similarly, the evidence proffered by plaintiff indicates that defendants facilitated the removal of her property. Plaintiff's evidence would support a finding that defendants on two occasions denied her requests to inspect the bag and even physically restrained her from inspecting it herself. The facts in the instant case, therefore, are analogous to the circumstances in *Soldal*. This Court thus concludes that if plaintiff's testimony is believed, her Fourth Amendment rights have been implicated in this case.

■ Having concluded that the plaintiff's Fourth Amendment rights may have been implicated, the Court now turns to the question of whether the defendants' actions were "reasonable." First, although defendants allege that they acted in accordance with the City's policy, plaintiff's testimony indicates that they did not. Clearly, their actions were not taken pursuant to a court order. If the defendants failed to follow the policy existing within the Division of Police this would be some evidence that their actions were unreasonable. Unlike *Haverstick*, defendant officers here allegedly did more than simply detain the plaintiff for questioning. If plaintiff is believed, they actually prevented her from inspecting the bag Revels removed from her residence. The record indicates that both parties claimed ownership of the items Revels removed from the residence. It was the plaintiff's residence. The officers could not have known who the real owner of the property was. If plaintiff's evidence is believed, they let Revels take whatever he pleased and failed even to observe him while he placed items in the bag. By refusing to permit the plaintiff to inspect the bag, they interfered with her ability to protect her property. No legitimate law enforcement interest was served by defendants' conduct. Their actions did not further any interest in maintaining the peace or stability of the situation since the parties involved in this dispute were separated and under control when plaintiff made her requests to inspect the bag. Neither is there any indication that the defendants had to make any split-second decisions. They clearly had sufficient time to analyze the situation to make sure that plaintiff's property was not removed from her residence. *See Graham v. Connor*, 490 U.S. at pp. 396–97, 109 S.Ct. at pp. 1871–72. The Court finds that such actions would violate the objective reasonableness standard of the Fourth Amendment.

**(c) Equal Protection**

■ Plaintiff has asserted claims of race and sex discrimination under the Equal Protection Clause of the Fourteenth Amendment. She argues that defendants' actions denied her equal protection because she has been treated differently than similarly situated residents in predominately white neighborhoods. She also argues that she has been treated differently than similarly situated male residents because of her sex.

To support a claim of race or sex discrimination under the Equal Protection Clause, the plaintiff must present proof of discriminatory intent or purpose. *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). The plaintiff has presented no evidence that defendants acted with discriminatory intent or purpose. Nor has she proffered any evidence of similarly situated white or male residents who were treated differently than her because of race or sex. Accordingly, the Court concludes that defendants' motion for summary judgment on this claim is well taken.

**III. CONSPIRACY CLAIMS**

The defendants assert that they are entitled to summary judgment on plaintiff's claim of conspiracy brought pursuant to 42 U.S.C. §§ 1983 and 1985(3).

■ In order to establish a claim under section 1985(3), the plaintiff must prove: 1) a conspiracy involving two or more persons; 2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws; 3) an act in furtherance of the conspiracy; and 4) which caused injury to a person or property, or a deprivation of any right or privilege of a citizen of the United States. *Johnson v.*

*Hills & Dales Gen. Hosp.,* 40 F.3d 837, 839 (6th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1698, 131 L.Ed.2d 560 (1995). The plaintiff must also show that the conspiracy was motivated by racial, or other class-based, invidiously discriminatory animus. *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971). There is no evidence in the record showing that any of these elements have been satisfied in this case. Plaintiff has produced no evidence showing that the defendants actions were motivated by any racial or gender bias. *See Haverstick Enterprises,* 32 F.3d at 994 (a class protected by section 1985(3) must possess the characteristics of a discrete and insular minority, such as race, national origin, or gender). The fact that defendants were working together as partners when the alleged constitutional deprivation occurred is not sufficient to establish a conspiracy under § 1985. Consequently, the Court concludes that defendants motion for summary judgment on this claim is well taken.

■ Plaintiff likewise fails to prove a conspiracy claim under section 1983. The elements of a civil conspiracy claim are as follows:

A civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage.

*Hampton v. Hanrahan,* 600 F.2d 600, 620–21 (7th Cir.1979). As evidence of a conspiracy under section 1983, the plaintiff makes the same argument, namely that defendants were working together as partners and that they allowed Revels to remove plaintiff's property. These allegations do not show that defendants engaged in a conspiracy to deprive the plaintiff of her property. Unsupported conclusions and inferences are insufficient to support a charge of conspiracy. *Simms v. Reiner,* 419 F.Supp. 468 (N.D.Ill. 1976). Absent any evidence of a plan to deprive the plaintiff of her civil rights, a conspiracy allegation cannot go to the jury. *Richardson v. City of Indianapolis,* 658 F.2d

494 (7th Cir.1981). Accordingly, the defendants' motion for summary judgment on this claim is well taken.

## IV. QUALIFIED IMMUNITY

■ Defendants Mathys and Miller assert that they are entitled to qualified immunity from liability on plaintiff's section 1983 claims. Under the qualified immunity doctrine outlined in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), government officials are immune from liability for civil rights damages insofar as their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. The focus is on the objective reasonableness of the official's conduct as measured by reference to clearly established law and the information which the official possessed. *Id.* at 818, 102 S.Ct. at 2738; *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

■ For a constitutional right to be clearly established, the law must be clear in regard to the official's particular actions in the particular situation. *Walton v. City of Southfield,* 995 F.2d at 1335. As the Supreme Court stated in *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039,

The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in light of pre-existing law the unlawfulness must be apparent.

The conduct of the official must fall clearly within the area protected by the constitutional right, such that a reasonable official would have known that his conduct violated the constitutional right. *Long v. Norris,* 929 F.2d 1111, 1115 (6th Cir.1991). The official is entitled to immunity where he reasonably could have thought that his actions were consistent with the rights allegedly violated. *Garvie v. Jackson,* 845 F.2d 647, 649 (6th Cir.1988).

The determination of whether a constitutional right is clearly established requires looking first to the decisions of the Supreme Court, then to decisions of the Sixth Circuit and courts within that circuit, and finally to decisions of other circuits. *Walton,* 995 F.2d at 1336. The decisions of other circuits are examined only in extraordinary cases. *Id.* The defendants bear the initial burden of coming forward with facts to suggest that they were acting within the scope of their discretionary authority. *Rich v. City of Mayfield Heights,* 955 F.2d 1092, 1095 (6th Cir.1992). Defendants have done so here. The burden then shifts to plaintiff to establish that defendants' conduct violated a right so clearly established that any official in defendants' position would have clearly understood that he was under an affirmative duty to refrain from such conduct. *Id.* The ultimate burden of proof is on the plaintiff to show that the defendants are not entitled to qualified immunity. *Wegener v. City of Covington,* 933 F.2d 390 (6th Cir.1991).

The question of whether the defendants are entitled to qualified immunity is one of law for the court. *Dominque v. Telb,* 831 F.2d 673, 677 (6th Cir.1987). In determining whether the defendants are entitled to qualified immunity, the court must decide whether there is a factual dispute on which the question of immunity turns, and what the state of the law was on January 2, 1993. *Rich,* 955 F.2d at 1095.

The right asserted by plaintiff must be particularized as opposed to the generalized right of person to be free from unreasonable seizures of his or her property under the Fourth Amendment. The qualified immunity inquiry must focus on whether there is any case law dealing with the more particularized right at issue in the case. *Rich,* 955 F.2d at 1097 (inquiry must be "whether there is any case law dealing with the more particularized right that is at issue in this case"). It is well established that the Fourth Amendment applies in the civil context. *Soldal, supra; New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985); *Michigan v. Tyler,* 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978); *Marshall v. Barlow's Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978); *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). However, this Court has been unable to locate any Supreme Court or Sixth Circuit decision prior to January 2, 1993 which specifically involved police officers who facilitated the seizure of a person's property by a private actor during a domestic dispute in violation of the Fourth Amendment. *Bonds v. Cox, supra,* would be the only Sixth Circuit precedent remotely analogous to the instant case, but that case was decided in 1994.

The qualified immunity inquiry requires a determination of whether the contours of the right being asserted were clearly established. The plaintiff argues that her Fourth Amendment rights were clearly established in light of *Soldal* which was decided prior to the defendants' actions. Although the facts in *Soldal* have some similarity to the facts alleged here by plaintiff Miller, *Soldal* is distinguishable in several respects. The Supreme Court in *Soldal* noted that the defendant officers knew that the owner of the mobile home park did not have a eviction order and that the owner's actions were unlawful. In the case at bar, even assuming the facts alleged by plaintiff are true, the record does not indicate that defendants Mathys and Miller knew that the property belonged to plaintiff and that Revel's actions were unlawful. Plaintiff Miller and Revels both claimed ownership of the property. Indeed, plaintiff's daughter, Ebony Crosby, stated that defendant Miller was not in the bedroom when Revels packed the trash bag with items allegedly belonging to him and thus could not have seen what he was removing. While the defendants' conduct may have been negligent, there is no indication that they knew the removal of the property was unlawful. In addition, *Soldal* involved an eviction that resulted from a landlord-tenant dispute and clearly defined state law which rendered the landlord's actions illegal. The instant case ostensibly involved a domestic dispute in which both parties claimed ownership of the property. The deputy sheriffs in *Soldal* knew that they were violating state law. The plaintiff has cited no clearly established Ohio law defining her

rights which defendants should have been aware of.

Further, the *Soldal* case was decided on December 8, 1992, less than one month prior to the incident in this case. This Court must apply a rule of reason to determine when a police officer should have learned of a decision and adjusted his or her conduct accordingly. The question is one of fairness in light of all of the facts. *Lintz v. Skipski*, 25 F.3d 304, 306 (6th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 485, 130 L.Ed.2d 397 (1994). It is unlikely that police officers such as defendants would have known that their actions implicated the plaintiff's Fourth Amendment rights in this context.

Plaintiff Miller has not met her burden of showing the existence of legal precedent clearly establishing that defendants' would have known that their conduct constituted a violation of plaintiff's Fourth Amendment rights.

## V. *STATE LAW CLAIMS*

The defendants next argue that they are entitled to summary judgment on plaintiff's claims of negligence and intentional and negligent infliction of emotional distress.

 In order to state a claim for intentional infliction of emotional distress, the defendants' conduct must be extreme and outrageous and the emotional distress suffered by the plaintiff must be severe and debilitating. *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 6 O.B.R. 421, 453 N.E.2d 666 (1983); *Paugh v. Hanks*, 6 Ohio St.3d 72, 6 O.B.R. 114, 451 N.E.2d 759 (1983). A court may determine pretrial if the plaintiff has supported a claim by determining whether the emotional distress alleged is serious as a matter of law. *Oswald v. Fresh Mark/Sugardale, Inc.*, Slip Op. No. CA–8906, 1992 WL 330282, 1992 Ohio App. LEXIS 5756 (5th App.Dist.1992); *Paugh*, 451 N.E.2d at 765. Severe and debilitating emotional distress may be found "where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." *Id.* 451 N.E.2d at 765. In applying this standard to determine if the emotional dis-

tress is serious, Ohio courts have held that an emotional injury is not severe and debilitating where the plaintiff fails to show that he sought medical or psychiatric help or was unable to work or otherwise function in his daily life. *Paige v. Youngstown Bd. of Education*, Slip Op. No. 93 C.A. 212, 1994 WL 718839, 1994 Ohio App. LEXIS 5942 (7th App.Dist.1994); *Plikerd v. Mongeluzzo*, 73 Ohio App.3d 115, 596 N.E.2d 601 (3rd App. Dist.1992); *Kurtz v. Harcourt Brace Jovanovich, Inc.*, 69 Ohio App.3d 267, 590 N.E.2d 772 (8th App.Dist.1990). The evidence proffered by plaintiff fails to show that she sought medical help or was unable to work or function in her daily life. Accordingly, the defendants' motion for summary judgment on this claim is well taken.

With regard to plaintiff's claims of negligence and negligent infliction of emotional distress, the plaintiff states that she will not pursue these claims. *See* pp. 24–25, Plaintiff's Memorandum Contra to Defendants' Motion for Summary Judgment (Doc. # 16). Because the plaintiff has failed to respond with evidence in support of these claims, the Court shall enter summary judgment in favor of defendants. *See* Fed.R.Civ.P. 56(e).

## CONCLUSION

In accordance with the forgoing, the motion for summary judgment of defendant City of Columbus is granted as to all of plaintiff's claims. The motion for summary judgment of defendants Mathys and Miller in their individual capacity is granted as to all of plaintiff's claims. The Clerk shall enter final judgment in favor of the defendants, dismissing plaintiff's complaint with prejudice at plaintiff's costs.

It is so ORDERED.