Angela Lee WILLIAMS, a minor, by her father and next friend, William Hardy WILLIAMS, Plaintiff–Appellant,

v.

Jerald M. ELLINGTON, et al., Defendants–Appellees.

No. 90–5993.

United States Court of Appeals, Sixth Circuit.

Argued March 21, 1991.

Decided June 24, 1991.

David A. Friedman (argued), American Civ. Liberties Union of Kentucky, Louisville, Ky., for plaintiff-appellant.

Robert L. Chenoweth (argued), Bryan, Fogle & Chenoweth, Frankfort, Ky., E. Dan Sharp, Jr., Sharp & Sharp, Mayfield, Ky., for defendants-appellees.

Before KRUPANSKY and NELSON, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

CELEBREZZE, Senior Circuit Judge.

Plaintiff Angela Williams, a minor, by her father and next friend William Hardy Williams, appeals the district court's order entering summary judgment in favor of Defendants Jerald Ellington, *et al.*, in this action under 42 U.S.C. § 1983 seeking monetary damages and injunctive and declaratory relief for the warrantless strip search of Williams performed by officials of Graves County High School located in May-

field, Kentucky. The named Defendants include Graves County High School Principal Ellington, Graves County Superintendent Billy Lee Watkins, Assistant Principals Maxine Easley and Donald M. Jones and five members of the Graves County School Board of Education.

On appeal, Williams alleges the Defendants' conduct violated her right to be free from unconstitutional searches pursuant to the fourth and fourteenth amendments to the United States Constitution. Williams also contends the district court erred in granting summary judgment on the basis of qualified immunity to Graves County School Board of Education sued in its official capacity and Defendants sued in their individual capacity. For the reasons stated below, we AFFIRM.

## I.

The record before us reveals that on Tuesday, January 19, 1988, Graves County High School Principal Jerald Ellington received a telephone call from a student's mother who expressed concern over a situation in which her daughter, Ginger, was confronted with drugs. Although no names were disclosed, the mother reported that a student had offered drugs to her daughter. Later that day, Ellington called Ginger into his office to learn more about the incident. Ginger reported that during typing class on the day before, she had seen Williams and another girl, Michelle, with a clear glass vial containing a white powder. Ginger also stated that the two girls placed the powder on the tips of their fingers and sniffed it. One of the girls then offered the powder to Ginger, but she refused it. Ellington asked Ginger if she had any problems with the girls, and was satisfied there was no animosity between them to provide Ginger with an ulterior motive for reporting the incident.

Ellington then spoke with Williams' typing instructor, Brenda Cobb, in whose class the alleged drug use occurred. When asked if she had noticed anything peculiar during class on the day of the purported drug use, Cobb indicated that Michelle's behavior was strange. Cobb approached Michelle, who told the teacher she had the "flu." Ellington then relayed Ginger's report to Cobb, prompting her to remember an incident involving Williams the previous semester. During the first semester, Cobb found a typed note under Williams' desk in which she had referred to parties involving her friends and the use of the "rich man's drug." When Cobb questioned Williams about the letter, the student passed it off as a joke, and a few months later when Cobb seemed satisfied that there was not a problem, she threw the letter in the trash.

During the next few days, Ellington also spoke with Mary Jean Young, Williams' aunt and school guidance counselor, and Michelle's father, so that both families would be apprised of the situation. Michelle's father expressed concern that Michelle might be using drugs and disclosed that Michelle had recently stolen $200.00 from his bureau drawer.

Also during this same week, Michelle came to Ellington and reported that another student, Kim, and Kim's boyfriend, Steve, were inhaling a substance called "rush." "Rush" is a volatile substance that can be purchased over the counter, and while possession of "rush" is legal, inhalation of it is illegal under Kentucky law.[1] Ky.Rev.Stat. 217.900. Coincidentally, Kim and Steve also came to Ellington and insisted that it was not them, but other students, who were using the substance. Following these reports, Ellington questioned the motives of these students in coming forward and the validity of the information.

---

1. Section 217.900 reads, in pertinent part:
(1) As used in this section:
"Volatile substance" means any glue, cement, or paint or other substance containing a solvent or chemical having the property of releasing toxic vapors or fumes which when inhaled may cause a condition of intoxication, inebriation, stupefaction, dulling of the brain or nervous system,

or distortion or disturbance of the auditory, visual or mental processes.
(2) It shall be unlawful for any person to intentionally smell or inhale the fumes of any volatile substance, or to induce any other person to do so for the purpose of inducing a condition described in subsection (1) of this section.... Ky.Rev.Stat. 217.900.

On Friday of this same week, January 22, Ginger stopped in to see Ellington during her fifth period geometry class to report "those girls are at it again," or words to that effect, and indicated she had observed the two girls with the white powdery substance again. Ellington sent Ginger back to class and decided to act on the information before the end of fifth period. Ellington contacted Assistant Principal Maxine Easley and apprised her of the week's events. Ellington and Easley then went to the geometry class and called Williams and Michelle out into the hall. Although Ellington observed that neither student appeared disoriented or intoxicated, the two girls were taken to the administrative offices. After escorting the girls into his office and confronting them with his suspicions, Michelle produced a small brown vial from her purse that contained "rush." Michelle claimed the vial belonged to Kim, and although both girls denied possession of any drugs, Ellington wanted to search the girls' lockers because the brown vial did not match the description given by Ginger.

At that time, Assistant Principal Donald Jones, who was also aware of the week's events, went to search Williams' assigned locker. No drugs were found in this locker, nor in the locker Williams had been using to store her personal items. Likewise a search of Williams' books and purse conducted by Assistant Principal Easley produced no evidence of drugs. Finally, Ellington asked Easley to take Williams into her office and search her person, in the presence of a female secretary.[2] Inside Easley's office, Williams was asked to empty her pockets which she promptly did. Easley then asked the girl to remove her T-shirt. Although she hesitated and appeared nervous, Williams complied after Easley repeated the request. Williams was then required to lower her blue jeans to her knees. In her deposition, Williams testified that Easley pulled on the elastic of her undergarments to see if anything would fall out, but Easley disputes this contention. The district court concluded this factual discrepancy was not material for summary judgment purposes, and as troubling as that conclusion may be, the veritable inconsistency need not be addressed in light of the rationale set forth below. Finally, Williams was told to remove her shoes and socks. Easley found no evidence of drugs as a result of this search.

William Hardy Williams, Appellant's father, lodged a complaint regarding the incident with the Graves County School Board of Education. The Board, in ratifying the conduct in question, believed there existed reasonable suspicion under the search and seizure policy to justify the actions of Defendants Ellington, Jones and Easley. Angela Williams, by her father and next friend William Hardy Williams, then instituted the present suit, pursuant to 42 U.S.C. § 1983, seeking damages and injunctive and declaratory relief.

Williams filed a motion for summary judgment; the district court ruled in favor of Defendants, and determined that Williams had not established the search was unconstitutional as a matter of law. The district court also granted Defendants' motion for summary judgment and held Defendants were entitled to qualified immunity from the suit, thereby dismissing all of Appellant's claims. On appeal, Williams challenges only the district court's ruling regarding Defendants' motion for summary judgment.

## II.

### A. Defendants Sued in Official Capacity

■ The School Board, its superintendent and members assert that as an arm of the state, the Board enjoys immunity from a 42 U.S.C. § 1983 suit under the eleventh amendment to the United States Constitu-

---

**2.** The "search and seizure policy," in effect at the time petitioner was searched, was instituted by the Board in 1985 and states the following: 1. A pupil's person will not be searched unless there is a reasonable suspicion that the pupil is concealing evidence of an illegal act.... When a pupil's person is searched, the person conducting the search shall be the same sex as the pupil; and a witness of the same sex shall be present during the search....
Graves County High School Student Handbook, 1987–88, p. 34.

tion. Further, the Board contends it is immune from liability based upon *Monell v. Dept. of Social Services of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and its progeny. We agree the Board is immune from suit according to *Monell*, and therefore we need not address the issue on the basis of the eleventh amendment.

In *Monell v. Dept. of Social Services of New York*, the Supreme Court held that although local governments are not absolutely immune from suits instituted under 42 U.S.C. § 1983, there are some instances where local governing bodies, or officials sued in their official capacities, may nevertheless enjoy immunity. *Monell*, 436 U.S. at 690–92, 98 S.Ct. at 2035–37. The Court concluded that a municipality [3] may not be held liable under § 1983 based on a theory of *respondeat superior;* instead, a government is responsible under § 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury...." *Id.* at 694, 98 S.Ct. at 2037. However, the *Monell* Court was not directly confronted with the municipal liability issue, thereby leaving for further development the "full contours" of such liability under § 1983 to "another day." *Id.* at 695, 98 S.Ct. at 2038.

In *Pembaur v. Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), the Court recognized that under the appropriate circumstances, "municipal liability may be imposed for a single decision by municipal policymakers ...." *Pembaur*, 475 U.S. at 480, 106 S.Ct. at 1298. Therefore, although liability may be imposed for an isolated decision made by policymakers, the Court expressed a need for "some limitation ... on establishing municipal liability through policies that are not themselves unconstitutional, or the test set out in *Monell* will become a dead letter." *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 821, 105 S.Ct. 2427, 2435, 85 L.Ed.2d 791 (1985). In leaving open the question

whether a municipality may be subject to liability for acts taken pursuant to a policy that is not unconstitutional, the Court stated:

> But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the "policy" and the constitutional deprivation.

*Id.* at 824, 105 S.Ct. at 2436. *See also City of Springfield v. Kibbe*, 480 U.S. 257, 268, 107 S.Ct. 1114, 1120, 94 L.Ed.2d 293 (1987) (*Monell's* causation requirement is satisfied if the municipality's conduct was the "moving force" in bringing about the constitutional deprivation).

In the present case, the search and seizure policy promulgated by the Graves County School Board is a facially valid district-wide policy, allowing for the search of a pupil's person if there is a reasonable suspicion that the student is concealing evidence of an illegal activity. In fact, the exact language of this policy reiterates the criteria set forth by the Supreme Court in *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985); in balancing a student's privacy interests under the fourth amendment against the need for order and safety in schools, the legality of a search of a student should depend upon the reasonableness of the search, under all the circumstances. *New Jersey v. T.L.O.*, 469 U.S. at 341, 105 S.Ct. at 742.

The search, which was performed in accordance with this constitutionally valid strip search policy, was subsequently ratified by the School Board when Mr. Williams filed a grievance. Therefore, Williams' only grasp at evoking municipal liability under § 1983 is to show that this subsequent ratification is sufficient to establish the necessary causation requirements. Based on the facts, the Board believed Ellington and his colleagues were justified in conducting the search of Williams. There was no history that the

---

**3.** The Court's holding clearly indicates that for the purposes of a § 1983 cause of action, school boards and municipalities are not to be distinguished. *Id.* at 696–99, 98 S.Ct. at 2038–40.

policy had been repeatedly or even sporadically misapplied by school officials in the past. Consequently, the School Board cannot be held liable for the ratification of the search in question, because this single, isolated decision can hardly constitute the "moving force" behind the alleged constitutional deprivation.

B. Defendants Sued in Individual Capacity

■ Principal Ellington, Assistant Principals Jones and Easley, Superintendent Watkins and Board members Goodman, Holmes, Howard, Hughes and Wiggins contend they are qualifiedly immune from a § 1983 suit for damages asserted against them in their individual capacities. The test for qualified immunity was enunciated in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In drawing no distinction between suits against state officials under 42 U.S.C. § 1983 and suits brought under the Constitution against federal officials, the Court held: "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, & n. 30, 102 S.Ct. at 2738, & n. 30; *accord Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985). "[W]hether an official ... may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (citations omitted); *accord Poe v. Haydon,* 853 F.2d 418, 423 (6th Cir.1988).

Relying on definite principles developed in previous cases, the Supreme Court in *Anderson* further elaborated on the particularity with which legal rights must be "clearly established":

[T]he right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.

*Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039 (citations omitted). Therefore, the appropriate question is whether Defendants believed, as reasonable officials under the same circumstances, their conduct was lawful and did not violate any constitutional rights that were clearly established at the time of the conduct at issue.

To determine what rights are "clearly established," we must look to decisions from the Supreme Court and from courts within this circuit. *See Ohio Civil Service Employees Ass'n v. Seiter,* 858 F.2d 1171, 1177 (6th Cir.1988); *accord Dominque v. Telb,* 831 F.2d 673, 677 (6th Cir.1987). This court has recognized that we may also consult decisions from the highest state court in which the case evolved. *See Eugene D. v. Karman,* 889 F.2d 701, 706 n. 6 (6th Cir.1989) (citing *Robinson v. Bibb,* 840 F.2d 349, 351 (6th Cir.1988)). In rare instances, where authority is lacking from these sources, we may also review decisions of other courts; however,

[f]or the decisions of other courts to provide such "clearly established law," these decisions must both point unmistakably to the unconstitutionality of the conduct complained of and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting.

*Ohio Civil Service Employees Ass'n v. Seiter,* 858 F.2d at 1177.

It is well established that students do not "shed their constitutional rights ... at the schoolhouse gate." *Tinker v. Des Moines Independent Community School District,*

393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). *New Jersey v. T.L.O.*, *supra*, remains the preeminent Supreme Court case discussing fourth amendment rights of school students within the confines of the educational environment. The Court in *T.L.O.*, in formulating a standard, concluded:

[T]he accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law.

*T.L.O.*, 469 U.S. at 341, 105 S.Ct. at 742.

Relying on the reasonableness test set forth in *Terry v. Ohio*,[4] 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Court in *T.L.O.* applied the same two-fold inquiry to determine what constitutes "reasonableness, under all the circumstances." *Id.* First, the search must be "justified at its inception," and a search will meet this requirement "when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *Id.* 469 U.S. at 342, 105 S.Ct. at 743. Second, the ensuing search must be reasonable in its scope, and such search will be permissible "when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.*

In *T.L.O.*, the Court upheld a Vice Principal's search of a student's purse for cigarettes based upon the observations of a teacher. *T.L.O.*, 469 U.S. at 328–29, 105 S.Ct. at 735–36. Despite the student's denial she was carrying any cigarettes in her purse, the official was not unreasonable in suspecting that a search of the purse would reveal evidence of the alleged behavior. *Id.* at 345, 105 S.Ct. at 744. The

Court also stated that when the official discovered rolling papers as the cigarette pack was first located, it was not unreasonable for the official to suspect possession of marijuana in the purse as well. Therefore, the extended search into a separate, zippered compartment of the purse was not unreasonable in scope. *Id.* at 347, 105 S.Ct. at 745.

A diligent but unsuccessful search for additional guidance from the designated jurisdictional pool leads us to a troubling conclusion: the reasonableness standard articulated in *New Jersey v. T.L.O.*, has left courts later confronted with the issue either reluctant or unable to define what type of official conduct would be subject to a 42 U.S.C. § 1983 cause of action. A thorough review of *T.L.O.* reveals that the Court was careful to protect a school official's right to make discretionary decisions in light of the knowledge and experience of the educator and the information presented to him or her at the time such decision was made. Like police officers, school officials need discretionary authority to function with great efficiency and speed in certain situations, so long as these decisions are consistent with certain constitutional safeguards. To question an official's every decision with the benefit of hindsight would undermine the authority necessary to ensure the safety and order of our schools.

In this case, it was not unreasonable for Principal Ellington, in light of clearly established rights at the time of the search *i.e. New Jersey v. T.L.O.*, to believe that the ordered searches were not a violation of Angela Williams constitutional rights. Likewise, it was not unreasonable for Assistant Principals Jones and Easley to follow Ellington's recommendation, after being fully briefed on the situation, and search Williams' locker, personal belongings and person. Consequently, subsequent ratification of the administrators' conduct by the School Board was not un-

4. To evaluate the reasonableness of a search and seizure, the Court's inquiry is two-fold: first, "whether the officer's action was justified at its inception, and [second,] whether it was

reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968).

warranted in light of clearly established rights.

Ellington's decision to search Williams and her possessions for the presence of drugs was based upon the events that occurred during the week of January 17, 1988. A study of the record leads us to conclude that Ellington and the remaining Defendants were not unreasonable in suspecting, based on the information available at the time, that a search of Williams would reveal evidence of drugs or drug use. Further, Defendants were not unreasonable, in light of the item sought (a small vial containing suspected narcotics), in conducting a search so personally intrusive in nature. A student approached Ellington with information that implicated Williams and Michelle using a white powdery substance during class. Although he was satisfied the informant had no ill motive toward either girl, Ellington went to Michelle's father and Angela Williams' aunt to inform them and attempt to verify the situation. Through a conversation with Michelle's father, Ellington learned that Michelle had stolen money from her father, and the father feared she was using drugs. Ellington also spoke with Ms. Cobb, the typing instructor, who noticed Michelle had appeared strange in class on the day of purported drug use, and when questioned, Michelle replied she had the "flu." Ms. Cobb also related the troubling event regarding Williams' typed letter referring to the "rich man's drug." A few days later, Ginger, the student who had informed Ellington of Williams' alleged drug use earlier that week, left geometry class twice so that she could see Ellington and report that the same girls were using drugs again. Finally, when the two girls were summoned for questioning in Ellington's office, Michelle quickly produced a small brown vial that contained "rush," a substance the inhalation of which is illegal.

Based on these particular facts, and in light of existing case law to guide Defendants, the search was not unreasonable at its inception. Nor was the scope of the search unreasonable, taking into account the size of the clear, glass vial that was sought and the suspected nature of the white powdery substance contained in the vial. After Williams' locker and purse were searched, it was reasonable for Ellington to suspect the girl may be concealing the contraband on her person. Further justification for the search is the close parallel between the particular facts of the present case and the facts surrounding *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). In *T.L.O.*, when the Vice Principal searched the student's purse for cigarettes, discovery of rolling papers created reasonable suspicion that the purse contained marijuana and therefore warranted an extended search. Like *T.L.O.*, after Ellington's initial suspicions were raised, new evidence appeared to justify the extended level of intrusion. In questioning the girls, Ellington already possessed reasonable suspicion to believe the students were concealing evidence of illegal activity; yet Michelle's production of the vial containing "rush," a substance of which inhalation is prohibited by law, warranted further investigation.

The question of qualified immunity in cases involving the fourth amendment rights of students is predicated upon rights that are "clearly established" by the Supreme Court and courts within this circuit; however, such courts have been virtually silent in defining these rights. Based upon the rights that were "clearly established" at the time of the search in question, we grant qualified immunity to Defendants sued in their individual capacity. As articulated in *New Jersey v. T.L.O.*, the standard by which searches and seizures carried out by school officials are scrutinized is whether the search was reasonable under the circumstances. In formulating a reasonable suspicion standard for the protection of a student's fourth amendment rights, the Court in *T.L.O.* heavily relied upon the same tests set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Therefore, Supreme Court decisions regarding an informant's tip in the aftermath of *Terry v. Ohio* are extremely helpful in establishing reasonable suspicion in the facts presented to us today.

In *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), the Supreme Court considered to what extent an informant's tip could be utilized to create reasonable suspicion and justify a police officer's limited protective search as recognized by the Court in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The Court in *Adams* rejected the notion that a stop and frisk based on a reasonable suspicion that the suspect may be armed and dangerous must derive only from an officer's personal observations. *Adams*, 407 U.S. at 147, 92 S.Ct. at 1924. In determining whether an informant's tip is sufficient evidence to meet the threshold of reasonable suspicion, the Court held that there must be an independent indicia of reliability to warrant a *Terry* stop. *Id.* at 146–47, 92 S.Ct. at 1923–24. Because the police officer in *Adams* was able to corroborate the disclosed information and the informant had proved to be a reliable source in the past, the Court distinguished this situation from the case of an anonymous telephone tip. *Id.* at 146, 92 S.Ct. at 1923.

The Court in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), determined whether an informant's tip could establish probable cause for purposes of the fourth amendment. In abandoning tests set forth in prior decisions,[5] the Court held that probable cause determinations, including those based upon an informant's tip, should be analyzed under the "totality-of-the-circumstances." *Gates*, 462 U.S. at 238, 103 S.Ct. at 2332. However, the "totality-of-the-circumstances" inquiry remained fairly undeveloped in the context of reasonable suspicion.

The Court recently decided this issue in *Alabama v. White*, —— U.S. ——, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). Police received an anonymous telephone call stating that the defendant would soon be traveling from her apartment to a local motel by car, and that she would be in possession of cocaine. *White*, 110 S.Ct. at 2414. The caller was very specific in detailing the defendant's address, the model and make of the car she would be driving, the destination to which she would be traveling and the type of container in which the drugs were to be carried. *Id.* The officers responding to the call located the defendant's address, and followed her vehicle to the designated motel. *Id.* The Court, in finding there was reasonable suspicion to make the initial stop under *Terry v. Ohio*, recognized in cases of anonymous tips, the need for "further investigation before a forcible stop of a suspect would be authorized." *Id.* 110 S.Ct. at 2416. However, the Court also suggested that a tip from a known and reliable informant, absent any other corroboration, may be sufficient to justify a *Terry* stop. *Id.* Therefore, it appears that although "reasonable suspicion is a less demanding standard than probable cause," both require the "totality-of-the-circumstances" inquiry:

> Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the "totality of the circumstances—the whole picture," that must be taken into account when evaluating reasonable suspicion. Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable.

*White*, 110 S.Ct. at 2416 (citations omitted).

We can correlate the allegations of a student, implicating a fellow student in unlawful activity, to the case of an informant's tip. While there is concern that students will be motivated by malice and

---

5. *See Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) *and Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). The Court had previously utilized a two-prong test developed primarily in these two cases to determine the existence of probable cause. First, the report must be reliable, or, alternatively, the informant's character must be trustworthy. Second, the report must contain, in sufficient detail, the underlying circumstances which constitute the informant's basis of knowledge. For a brief discussion of the Court's transition from the two-prong test to the totality-of-the-circumstances test, see *The Supreme Court, 1982 Term*, 97 Harv.L.Rev. 177–85 (1983).

falsely implicate other students in wrong-doing, that type of situation would be analogous to the anonymous tip. Because the tip lacks reliability, school officials would be required to further investigate the matter before a search or seizure would be warranted.

However, as in the case here, some tips, though unverified, are reliable. Principal Ellington carefully questioned Ginger about any improper motive for making the allegations, and was satisfied none existed. In fact Williams, in her deposition, stated she knew of no malice or ill will between she and Ginger. Moreover, in addition to Ginger's "tip," other evidence was presented to Ellington during the course of that same week. There was the discovery of Williams' letter found in typing class, the suspicions of Michelle's father that his daughter was using drugs and Michelle's production of the vial containing "rush." Based on the totality of the circumstances, there existed both the quality and quantity of information for Ellington to reasonably suspect Williams was concealing evidence of illegal activity on her person.

We hold Defendants sued in their individual capacity are qualifiedly immune from suit under 42 U.S.C. § 1983.

### III.

As demonstrated by the preceding rationale, Williams' claims for damages must necessarily fail. The remaining remedy Williams' seeks is injunctive relief prohibiting Defendants from conducting future strip searches in violation of Williams' fourth amendment rights. However, absent a "showing of any real or immediate threat that ... [Williams] will be wronged again," this Court is without jurisdiction to hear Williams' claim for injunctive relief. *City of Los Angeles v. Lyons,* 461 U.S. 95, 111, 103 S.Ct. 1660, 1670, 75 L.Ed.2d 675 (1983); *accord Brock v. Internat'l Union, UAW,* 889 F.2d 685, 692 (6th Cir.1989). Therefore, because Williams has failed to show any real threat of immediate injury, her claim for injunctive relief does not warrant the issuance of an injunction.

Consequently, Williams' pendent state law claims were properly dismissed. *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

### IV.

Based on the foregoing, the district court's granting of summary judgment in favor of Defendants is AFFIRMED.