Shaneequa WATKINS, et al., Plaintiffs,

v.

The MILLENNIUM SCHOOL,
et al., Defendants.

No. 2:02 CV 92.

United States District Court,
S.D. Ohio,
Eastern Division.

Nov. 18, 2003.

Daniel Scott Smith, Columbus, OH, for Plaintiffs.

Richard Wayne Ross, Means Bichimer Burkholder & Baker, Columbus, OH, for Defendants.

## *ORDER AND OPINION*

MARBLEY, Judge.

### I. INTRODUCTION

This matter is before the Court on Defendants', The Millennium School's ("Millennium School") and Kelly Apley's ("Apley"), Motion for Summary Judgment, filed February 28, 2003. For the following reasons, the Court **GRANTS** the Defendants' Motion for Summary Judgment in part and **DENIES** it in part.

### II. FACTS

Plaintiff, Shaneequa Watkins Tartt ("Watkins"), attended school during her

second and third grade years at Defendant Millennium School. Plaintiffs, Rodney and Tracy Tartt ("the Tartts"), are Watkins' adoptive parents and legal guardians. The Tartts instituted this action on December 21, 2001, against Millennium School, a community school under Ohio Revised Code Chapter 3314, and Apley, who was a teacher at Millennium School in May 2001, when the events at issue took place.

During the 2000–2001 school year, Watkins was in the third grade at Millennium School, and her classroom teacher was Ms. Chapman. On May 7, 2001, however, Watkins was spending the day in Apley's classroom. Around lunchtime on that day, Apley discovered ten dollars missing from her desk. The money belonged to another student who had brought it to school for a field trip and stowed it in Apley's desk for safekeeping. Upon discovering the money was gone, Apley decided to question the three students present in her classroom when the money was discovered missing. One of those students was Plaintiff Watkins.

As Watkins and her two friends were heading from lunch to recess, Apley stopped them and requested that they accompany her to Ms. Chapman's classroom, where the girls' book bags were located. They did so, and the girls checked their book bags, but no money was found. At this point, according to Watkins' testimony, the other two girls began to cry, although she did not. They then returned, with Apley, to her classroom. Once there, Apley requested that the girls empty out their pockets; and they did, but again, no money was discovered. What Apley requested next lies at the heart of this controversy, because Plaintiffs do not contest the search of Watkins' book bag and pockets.

Defendant Apley next requested the girls to pull the waistband of their pants out, so she could check their waistlines for the missing money.[1] All three girls complied with Defendant Apley's request. Then, Watkins claims she, alone, was asked to accompany Apley to a supply closet, where again, Apley requested of Watkins to pull out her pants, which Watkins did, so that Apley could look down into them for the missing money.

At the time Defendant Apley conducted the search, the Millennium School had its own search and seizure policy, Policy 425. Policy 425 provided, in part, "no Student be searched without reason or in an unreasonable manner." Furthermore, it required "[t]he search of a Student's person

---

1. There is some disparity in the way the parties each characterize this event, and the excerpted portions of Watkins' deposition, submitted as an Exhibit to the parties' motions, do not clarify the matter. Defendants claim "Apley asked Watkins and the other two students to turn over her [sic] waistband," whereas Plaintiffs describe that Defendant Apley "directed each student to pull open their [sic] pants to determine whether the money was hidden in their [sic] underwear." In her deposition, Plaintiff Watkins repeats that she "had to check [her] pants," and responds affirmatively to the question "And [Apley] looked in your pants?" In response to questioning during deposition as to "when you say 'open,' did you just kind of pull them

out away from your waist?" Watkins responded "yes."

The Court believes there is a difference between Apley requesting the girls simply to turn down their waistbands, as opposed to her requesting the girls to pull open their pants, underwear and all, and then proceeding to look directly at the girls' private areas. For purposes of summary judgment, however, even in the light most favorable to Plaintiffs, the facts before this Court establish only that Defendant Apley looked into Watkins' pants and not necessarily at her most private parts. This finding, however, does not affect the Court's determination in this matter, because under either construction of the facts, the Court would decide as it does.

or intimate personal belongings shall be conducted by the Chief Executive Officer. This person should be of the Student's gender and conduct the search in the presence of another staff member of the same gender." The parties do not dispute that Apley did not comply with the policy requirement of having the Chief Executive Officer conduct the search, Defendants state only that "while [Apley's] action may have been unwise in the face of such policy, her actions do not constitute a violation of the United States Constitution."

Nevertheless, after Apley conducted the search, Watkins states that she and the other girls, along with the rest of the students, returned to their work. Throughout the remainder of the day, no one, including Defendant Apley, said anything more about the money. Plaintiff Watkins testified that she was able to complete her work after the incident and admitted that at no time was she scared or worried that she was in trouble, nor did she ever cry, even when she was alone with Defendant Apley in the supply closet.

Once home, Plaintiff Watkins told her mother, Tracy Tartt, that "Ms. Apley checked [her] pants." Thereafter, the Tartts left phone messages at Millennium School for the Principal and the Superintendent regarding the incident. The next day, upon speaking with the Principal, Ms. Matthews, Plaintiff Rodney Tartt informed her that he would be seeking legal representation.

## III. STANDARD OF REVIEW

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

To prevail, the movant must establish that there are no genuine issues of material fact. This task may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir.1993). In response, the nonmoving party must present "significant probative evidence" to show "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir.1993). The nonmoving party "may not rest upon its mere allegations ... but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir.1994). Finally, the mere existence of a scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir.1995).

## IV. ANALYSIS[2]

### A. Assault Claim

Defendant Apley did not commit an assault upon Plaintiff Watkins, Defendants

---

**2.** In Plaintiffs' Memorandum in Opposition, the following claims were voluntarily dismissed and, accordingly, are not considered:

1) state law battery claim against Defendant Apley; and 2) intentional infliction of emo-

argue, because at no time did Apley intend to threaten or attempt to harm or touch Watkins. Defendants rely on Watkins' deposition testimony, where she testified that throughout the whole event, including Defendant Apley taking her alone to the supply closet, she did not cry, nor did she feel threatened or harmed. She also stated in her deposition that Defendant Apley never touched her in any way. Furthermore, Defendants argue, Apley is protected from personal liability because her actions were within the scope of her duties and certainly not manifestly outside of them. Teachers must manage the classroom, enforce school rules, and investigate rule violations. She did not act maliciously, in bad faith, or in a wanton and reckless manner, so she is shielded from personal liability under Ohio Revised Code, Chapter 2744. Because none of the exceptions to the broad sovereign immunity doctrine applies, Defendants contend, Apley cannot be personally liable.

Plaintiffs claim that Defendant Apley's act of "direct[ing] Watkins to go with her to a supply closet where she told her again to pull open her pants and inspected her private areas," constitutes an assault. According to Plaintiffs, the lack of physical contact and Apley's subjective intent are irrelevant, and Defendant Apley is liable for assault, despite the broad sovereign immunity conferred by Chapter 2744. In support of denying Defendant Apley qualified immunity, Plaintiffs point out that her actions violated Defendant Millennium School's Policy 425, the search and seizure policy. Plaintiffs assert that Defendant Apley's actions were beyond the scope of her employment and in reckless disregard of Plaintiff Watkins' safety and rights.

Under Ohio law, an assault is "the willful threat or attempt to harm or touch another offensively, which threat or attempt reasonably places the other in fear of such contact." *Smith v. John Deere Co.*, 83 Ohio App.3d 398, 614 N.E.2d 1148, 1154 (1993). The "threat or attempt must be coupled with a definitive act by one who has the apparent ability to do the harm or to commit the offensive touching. An essential element of the tort of assault is that the actor knew with substantial certainty that his or her act would bring about harmful or offensive contact." *Id.* at 1154.

Viewing the evidence in the light most favorable to Plaintiffs, there is no evidence of an assault before this Court. First, there is no evidence that Defendant Apley threatened Plaintiff Watkins or attempted to harm or to touch her offensively. Initially, Defendant Apley questioned Watkins, along with and in the presence of two other girls, about the missing money. Then, she asked Plaintiff to accompany her to a more private location to inspect the waistband of Plaintiff's pants, which Watkins did without fear, according to her testimony.

Second, at no time did Defendant Apley commit the "definitive act" required to prove an assault. Watkins' deposition testimony confirms that Apley never touched her, much less in an offensive manner. And, there is no evidence that Plaintiff Watkins was placed in fear of such contact, either reasonably or unreasonably. Watkins' deposition testimony confirms that she did not feel threatened by Defendant Apley's conduct at any time. She did not cry, although the other two girls present did. In response to questioning from defense counsel, Plaintiff even stated that

tional distress claim against Defendant Millennium School. Furthermore, Plaintiffs conceded that there is insufficient evidence to support a finding under respondeat superior against Defendant Millennium School, under 42 U.S.C. § 1983. For the same reasons, it is not discussed either.

she had no trouble returning to her work after the incident. Finally, Plaintiffs have offered no evidence that Defendant Apley knew with substantial certainty that her act would bring about an offensive contact. Quite to the contrary, Apley never attempted to touch Plaintiff.

In response to the aforementioned evidence, Plaintiffs ask the Court to discount Watkins' deposition testimony because she is an eight year old girl. However, this evidence is highly probative, and it undermines Plaintiffs' assault claim because it illustrates how Watkins felt at the time of the incident. An essential element of the tort of assault is that the plaintiff was "reasonably place[d] ... in fear of such contact." Therefore, it certainly cannot be ignored on a Motion for Summary Judgment that Plaintiff stated she was never frightened, scared or threatened by Apley's actions.

Instead, Plaintiffs ask the Court to rely upon testimony by Plaintiff Rodney Tartt about his daughter's behavior after she arrived home from school that night. Even assuming Plaintiff was upset upon recounting the event that night, such manifestation does not make an assault out of conduct that occurred earlier in the day. Thus, the Court **GRANTS** Defendants' motion on Plaintiffs' assault claim against Defendant Apley.

Because Plaintiffs have failed to set forth a genuine issue of material fact on their assault claim, it is unnecessary for the Court to consider the issue of whether Defendant Apley would be entitled to qualified immunity under Chapter 2744 of the Ohio Revised Code.

### B. 42 U.S.C. § 1983, Fourth Amendment Claim

Defendants argue that Apley's search of Plaintiff Watkins was reasonable. Because it was justified at its inception, and the scope and measures used were reasonably related to the objectives of the search, it satisfied the constitutional requirements for a permissible search by a school official. In addition, Defendants profess that Apley is not liable because she is protected by qualified immunity.

Plaintiffs retort that individualized suspicion was required and lacking; thus, Defendant Apley was not justified in searching Plaintiff Watkins. Next, they contend that the measures and scope were not reasonably related to the search's objectives, so the search, *a fortiori*, violated the Fourth Amendment. Finally, Plaintiffs argue qualified immunity does not apply because Defendant Apley's actions were unreasonable in light of the circumstances.

Section 1983 provides:

Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983.

There are two essential elements of a § 1983 claim: (1) "there must be a deprivation of the plaintiff's '... rights, privileges, or immunities secured by the Constitution and laws ....' of the United States;" and (2) "the plaintiff must allege that the defendants deprived him of this constitutional right 'under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory." *Dunn v. Tennessee*, 697 F.2d 121, 125 (6th Cir. 1982) (citations omitted). To succeed on a claim, the plaintiff must show that: (1) a person (2) acting under color of state law (3) deprived her of her rights secured by the United States Constitution or its laws. *Waters v. City of Morristown*, 242 F.3d

353, 358–59 (6th Cir.2001). By its terms, however, § 1983 creates no substantive rights; it merely provides remedies for deprivations of established rights. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (citation omitted).

Defendants do not dispute that Apley was a person acting under color of state law. They contest, however, that Apley deprived Watkins of her rights secured by the United States Constitution. Plaintiffs claim Apley violated Watkins' Fourth Amendment rights. The Fourth Amendment of the United States Constitution provides, in part, "[t]he right of people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV.

▆▆▆ The constitutional jurisprudence is well-established that school officials are subject to the mandates of the Fourth Amendment. *New Jersey v. T.L.O.*, 469 U.S. 325, 333, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). Even on school property, students have legitimate expectations of privacy. *Id.* at 339, 105 S.Ct. 733. The Supreme Court first addressed the extent of a student's Fourth Amendment rights in *New Jersey v. T.L.O.* Although holding that the Fourth Amendment's prohibition against unreasonable searches and seizures applied to students, the Court refused to require teachers and administrators to have probable cause prior to a search. Instead, in *T.L.O.*, the Court set forth a two-part test to determine whether a student search complied with constitutional dictates. First, the search must be justified at its inception. If it is, then the second prong requires that the search also be reasonably related in scope to the circumstances justifying it. *Id.* at 341, 105 S.Ct. 733.

Even before the Supreme Court's decision in *T.L.O.*, however, the Sixth Circuit cautioned that "federal courts should not become entwined in the day to day decision making of teachers and school administrators. The responsible school official must be afforded the necessary discretion to carry out his duties." *Tarter v. Raybuck*, 742 F.2d 977, 983 (1984). And, again, after *T.L.O.*, the Sixth Circuit noted, upon,

> [a] thorough review of *T.L.O.*, the [Supreme] Court was careful to protect a school official's right to make discretionary decisions in light of the knowledge and experience of the educator and the information presented to him or her at the time such decision was made. Like police officers, school officials need discretionary authority to function with great efficiency and speed in certain situations, so long as these decisions are consistent with certain constitutional safeguards. To question an official's every decision with the benefit of hindsight would undermine the authority necessary to ensure the safety and order of our schools.

*Williams by Williams v. Ellington*, 936 F.2d 881, 886 (6th Cir.1991). With that background in mind, the Court first must determine whether Defendant Apley's search of Plaintiff Watkins was justified at its inception.

### 1. "Justified at its Inception" Analysis under *T.L.O.*

▆▆▆ A search is justified at its inception " 'when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school.' " *Id.* at 886 (citing *T.L.O.*, 469 U.S. at 342, 105 S.Ct. 733). Whether there are "reasonable grounds" requires an inquiry, first, into whether individualized suspicion was a necessary prerequisite to the search. In *T.L.O.*, the Supreme Court expressly declined to address the issue of whether

individualized suspicion always is required to meet the reasonableness test for student searches, but it did state,

> Exceptions to the requirement of individualized suspicion are generally appropriate only where the privacy interests implicated by a search are minimal and where "other safeguards" are available "to assure that the individual's reasonable expectation of privacy is not subject to the discretion of the official in the field."

*T.L.O.*, 469 U.S. at 342, 105 S.Ct. 733 (citing *Delaware v. Prouse*, 440 U.S. 648, 654–655, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)).

 In a later case not involving school children, the Supreme Court in *Skinner v. Ry. Labor Executives' Ass'n*, did reason that "a showing of individualized suspicion is not a constitutional floor, below which a search must be presumed unreasonable. In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 624, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (citation omitted). According to the *Skinner* court, then, whether individualized suspicion is necessary requires a balancing of plaintiff's and defendant's interests. Hence, to determine whether individualized suspicion was necessary in this case requires the Court to balance Plaintiff Watkins' privacy interests against the interests of Defendants.

 In addressing this issue, both parties rely on the Eleventh Circuit's decision in *Thomas v. Roberts*, 261 F.3d 1160 (2001). In *Thomas*, the Court considered the unique situation where some students were subjected to strip searches, but one student was not. There, fifth-grade boys were required[3] to pull down their pants and underwear to their ankles, and girls were made to drop their pants, raise their dresses and skirts, and, in some cases, remove their bras and expose their breasts. *Id.* at 1164. The court concluded that in the instances where students were required to remove their clothing, individualized suspicion was necessary, but not in the instance of the student not subjected to a strip search. Plaintiffs, therefore, argue the facts of this case are more akin to the *Thomas* strip searches, whereas the Defendants claim the facts are more like the student who was not required to remove his clothing in *Thomas*, where the court found individualized suspicion was not necessary.

Ostensibly, the search of Plaintiff Watkins is distinguishable from the strip searches in *Thomas*. Watkins was not asked to strip off her clothing. The Eleventh Circuit, under circumstances where the students were required to strip down, had no difficulty concluding that the balancing test required individualized suspicion.

On the other hand, construing the evidence in the light most favorable to Plaintiffs, the facts of this case also are sufficiently distinguishable from the *Thomas* student who was not required to remove his clothing. That student, Lenard Grace, testified that the school official made him pull out his pants pockets and loosen his belt, after which the official shook Lenard's pants. *Id.* at 1169. There was no

---

**3.** Actually, the parties in *Thomas* disputed the facts, including the extent of the searches. However, because the Eleventh Circuit was reviewing a grant of summary judgment, it construed the facts in favor of the nonmoving party, the children in that case, and the description provided above was based on testimony given by the children.

evidence in *Thomas*, however, that the official looked into Lenard's pants. In contrast, Watkins testified that while Apley did not touch her, Apley did look into her pants on both occasions, once in the presence of the other two girls, and again in the supply closet when Plaintiff was alone with Apley.

In applying the *Skinner* balancing test, the Eleventh Circuit was adamant that, "there is no question that schoolchildren retain a legitimate expectation of privacy in their persons, including an expectation that one should be able to avoid the unwanted exposure of one's body, especially one's 'private parts'." *Id.* at 1168. It concluded the students' privacy interests, under those circumstances, outweighed the interests of the school officials. Of particular relevance to this case, it stated,

> A student's theft of another student's money, while possibly a petty offense outside of the classroom, could seriously impact a teacher's ability to maintain a safe and effective learning environment. School officials also have a significant interest in assuring that children do not receive the message that stealing is acceptable behavior. However, there is no reason to believe that the government's interests in maintaining classroom discipline and promoting moral development would have been jeopardized if [the school officials] were required to possess individualized suspicion before forcing the children to remove their clothing.

*Id.* at 1169.

This Court agrees with the *Thomas* court's rationale. Although Plaintiff Watkins was not required to remove her clothing, Plaintiffs have offered evidence that she was required to expose the private areas of her body underneath her pants. Assuming Watkins was wearing underwear, a missing ten dollars still does not justify such an intrusion, absent individualized suspicion. In comparison, the Millen-

nium School's interests in maintaining school order, disciplining for violation of school rules, and instilling values against theft would not have been jeopardized by the requirement of individualized suspicion.

Notably, this case does not present circumstances warranting urgency and quick response by school officials, which has concerned other courts. It was cases of suspected drug use and gun possession, for example, that worried the Sixth Circuit when it said, "[l]ike police officers, school officials need discretionary authority to function with great efficiency and speed *in certain situations*, so long as these decisions are consistent with certain constitutional safeguards. To question an official's every decision with the benefit of hindsight would undermine the authority necessary *to ensure the safety* and order of our schools." *Williams*, 936 F.2d at 886 (emphasis added). The Court in *Thomas* also recognized this distinction. It explained, noting the difference between those cases and the petty theft issue before it,

> This case is unlike [those cases], in which a school district was faced with a seemingly intractable problem of students using dangerous narcotics in and around school. Nor is this a case where, for example, school officials receive information that an unidentified student may be carrying a weapon or other dangerous article on school property, therefore requiring a generalized search to avoid an immediate threat of physical harm to students, faculty, or staff. There has simply been no showing here that important government interests were in such jeopardy that an intrusive mass search was permissible.

261 F.3d at 1169.

The theft of ten dollars obviously is distinguishable from a student suspected of drug use or weapon possession. Under

the circumstances here, the Court concludes Defendant Apley needed reasonable suspicion for the initial search of Plaintiff Watkins, but individualized suspicion for the additional search conducted in the supply closet.

The privacy interests of the initial search, as compared to the supply-closet search, are distinguishable and more minimal. Plaintiffs have offered evidence that Watkins and the other two girls were asked to turn down their waistbands. Such a request is not unreasonable in light of the fact that they were the only students present in Apley's classroom when the money was discovered missing and they could have been hiding the money on the inside of their waistbands. As required by *T.L.O.*, Defendant Apley had reasonable grounds for suspecting that such a search would turn up the money. Furthermore, the presence of the other two girls provided a safeguard in the form of two other witnesses.

Conversely, Defendant Apley's supply-closet search does not pose the situation contemplated by the *T.L.O.* Court when it explained, "[e]xceptions to the requirement of individualized suspicion are generally appropriate *only where* the privacy interests implicated by a search are *minimal* and where *'other safeguards'* are available 'to assure that the individual's reasonable expectation of privacy is not subject to the discretion of the official in the field.'" *T.L.O.*, 469 U.S. at 342, 105 S.Ct. 733 (emphasis added) (citing *Delaware v. Prouse*, 440 U.S. at 654–655, 99 S.Ct. 1391). Watkins' privacy interests were not minimal in the supply-closet search. Defendant Apley took Watkins away from her peers, alone, and into a supply closet, asked her to pull open her pants a second time, and then proceeded to look into them. In addition, although there were "other safeguards" available, namely Defendant Millennium School's Policy 425, it

is undisputed that Defendant Apley did not comply with that Policy. The school's interests, however, would not have been jeopardized if Defendant Apley had taken the time to get the Chief Executive Officer to conduct the search in her presence, as required by Policy 425. Defendant Apley's noncompliance subjected Plaintiff Watkins' privacy interests to Defendant Apley's sole discretion, which was what the Supreme Court feared in *T.L.O.*

■■■ Upon application of the *Skinner* balancing test here, it is evident that the interests of the Defendants in maintaining school order and instilling moral values against theft cannot outweigh Watkins' privacy interests. Defendant Apley was required to have individualized suspicion prior to the additional, supply-closet search of Watkins, and Defendants have provided no evidence that Defendant Apley had any. Therefore, Plaintiffs have presented a genuine issue of material fact suggesting that this search was not justified at its inception.

### 2. Qualified Immunity Analysis

■■■ Even if the search was not justified at its inception and, therefore, may have been unreasonable under the Fourth Amendment, Defendant Apley will not be liable if she is entitled to qualified immunity. Indeed, government officials sued in their individual capacities can seek qualified immunity. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity extends to individuals performing discretionary functions, unless their actions violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* A right is clearly established if "a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S.

635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

 "[W]hether an official . . . may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Id.* at 639, 107 S.Ct. 3034 (citations omitted). In elaborating on "clearly established," the Supreme Court stated in *Anderson v. Creighton* that,

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Id.* at 635, 107 S.Ct. 3034.

In accord, the Sixth Circuit reiterated in *Williams by Williams* that, "the appropriate question is whether Defendants believed, as reasonable officials under the same circumstances, [that their] conduct was lawful and did not violate any constitutional rights that were clearly established at the time of the conduct at issue." 936 F.2d at 885.

 The Sixth Circuit created a three-part test to determine whether a defendant is entitled to qualified immunity. Pursuant to that test, the Court is to examine: (1) whether the facts taken in the light most favorable to plaintiff could establish a constitutional violation; (2) whether the right was a "clearly established" right of which any reasonable officer would have known; and (3) whether the official's actions were objectively unreasonable in light of that clearly established right. *Williams v. Mehra,* 186 F.3d 685, 691 (6th Cir.1999) (en banc).

 Applying the *Williams* test, the Court has already determined that a constitutional violation may have occurred. The next issue then is whether the right was "clearly established" such that a reasonable official would have known about it. In this case, a reasonable teacher should have known that students have Fourth Amendment rights against unreasonable searches and seizures. The Supreme Court decided *T.L.O.* in 1985, clarifying that the Fourth Amendment applies to searches conducted by school officials. 469 U.S. at 336–37, 105 S.Ct. 733. Even before *T.L.O.,* the Sixth Circuit in *Tarter v. Raybuck* held,

> [i]t is beyond peradventure that school children do not shed their constitutional rights at the school house gate. It is well recognized that school officials are subject to constitutional restraints as state officials. School officials, employed and paid by the state and supervising children, are agents of the government and are constrained by the Fourth Amendment.

742 F.2d at 981. Finally, in the case at bar, Defendant Millennium School's own policy proscribed unreasonable searches and seizures. Thus, the second prong of the *Williams* test also has been met.

The third prong—whether the official's actions were objectively unreasonable in light of clearly established rights—is the most contentious because there are no comparable cases such that it could be said that Defendant Apley should have understood that what she was doing violated Plaintiff Watkins' privacy rights. Even *Thomas,* to the extent that it is analogous, was decided after the events in question took place. However, the *Williams* test is in accord with *Anderson v. Creighton,* where the Supreme Court considered *not* whether the defendant should have known, but whether the official's actions were "ob-

jectively unreasonable" in light of the clearly established right.

■ This Court finds that Plaintiffs have presented a genuine issue of material fact regarding whether Defendant Apley is entitled to qualified immunity. As explained by the Court in *Anderson v. Creighton*, the official is not protected by qualified immunity just because this *very* action previously has not been held unlawful. 483 U.S. at 635, 107 S.Ct. 3034. A reasonable jury could find Defendant Apley acted objectively unreasonable in requesting Plaintiff Watkins to accompany her alone, and into a supply closet, to conduct a second search, despite having no apparent basis to search further. A reasonable jury also could conclude that Defendant Millennium's School Policy 425 put Apley on notice that her actions in contravention of that policy would be objectively unreasonable. Hence, the Court **DENIES** Defendants' Motion on Plaintiffs' § 1983 claim.

## C. Intentional Infliction of Emotional Distress Claim

Plaintiffs claim Apley intentionally inflicted emotional distress upon Watkins. Defendants argue simply that Plaintiffs cannot prove the elements of a claim for intentional infliction of emotional distress. Defendant Apley's conduct, they contend, "did not rise to the required level of extreme and outrageous conduct." Plaintiffs retort that Defendant Apley's conduct was outrageous and that the question of its degree is for the jury, and not this Court, to determine.

■ To prove a claim of intentional infliction of emotional distress, the plaintiff must show that the defendant intentionally or recklessly caused her serious emotional distress by extreme and outrageous conduct. *McNeil v. Case W. Reserve Univ.*, 105 Ohio App.3d 588, 664 N.E.2d 973, 975 (1995) (citing *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 453 N.E.2d 666 (1983)). The behavior complained of must go beyond the intentionally tortious or even the criminal. *Yeager*, 453 N.E.2d at 671. The conduct must be so extreme and outrageous as " 'to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Id.* at 671 (quoting Rest.2d of Torts § 46, cmt. d (1965)).

■ The emotional distress allegedly suffered must be serious. *Id.* Serious emotional distress may be found where a reasonable person would be unable to cope adequately with the mental distress engendered by the circumstances of the incident. *Miller v. Currie*, 50 F.3d 373, 378 (6th Cir.1995) (citation omitted). Serious emotional distress may not be found, however, where the plaintiff fails to show she sought medical or psychiatric help or, at least then, she must show that she was unable to function in daily life. *Miller v. City of Columbus*, 920 F.Supp. 807, 824 (S.D.Ohio 1996) (citations omitted).

■ In order to defeat a motion for summary judgment on a claim of intentional infliction of emotional distress, the plaintiff must present evidence sufficient to create a genuine issue of material fact as to the defendant's behavior and the severity of the injury suffered. *McNeil*, 664 N.E.2d at 975–76; *see Uebelacker v. Cincom Sys., Inc.*, 48 Ohio App.3d 268, 549 N.E.2d 1210, 1220 (1988) (finding that the plaintiff raised a genuine issue of material fact as to his emotional distress when he submitted an affidavit from his wife detailing the various symptoms of his distress). And, contrary to Plaintiffs' argument, "[i]t is well accepted that intentional infliction of emotional distress claims may entirely appropriately be dealt with on summary judgment ..." *Miller v. Currie*, 50 F.3d at 377–78. A district court may find, as a matter of law, that certain conduct does not rise to the level of outrageousness

required to state a claim for intentional infliction of emotional distress. *Id.* at 377. Moreover, "[a] court may determine pretrial if the plaintiff has supported a claim by determining whether the emotional distress alleged is serious as a matter of law." *Miller v. City of Columbus,* 920 F.Supp. at 824.

■ For reasons already set forth, as a matter of law, Defendant Apley's conduct was not so outrageous as to be deemed "atrocious, and utterly intolerable in a civilized community," especially in comparison to the conduct of school officials in other cases.

As for emotional distress, Plaintiffs have submitted no evidence documenting any emotional distress. Plaintiffs contend only, in their Memorandum in Opposition, that "most parents of eight year old girls would be shocked and outraged if their child was subjected to Defendant Apley's conduct." Assuming, *arguendo,* that were true, Plaintiffs point to no evidence that Rodney and Tracy Tartt, themselves, were shocked and outraged. "Mere allegations" are insufficient to survive a motion for summary judgment. Although not cited to in their Memorandum in Opposition, Mr. Tartt states in his deposition that Plaintiff Watkins was "upset" and that he was "angry." But, such statements do not amount to even a mere "scintilla" of evidence. Being upset and angry is not illustrative of serious emotional distress, without more.

The other evidence before this Court is Mr. Tartt's admission that he and Mrs. Tartt did not take Plaintiff Watkins to be examined after she told them about the incident. As stated above, though, serious emotional distress cannot be found where the plaintiff did not seek medical or psychiatric help. *Miller v. City of Columbus,* 920 F.Supp. at 824. Moreover, Plaintiff Watkins' deposition testimony establishes that she had no difficulty functioning after the incident during the rest of the school day. Such evidence does not establish a genuine issue of material fact that she has been unable to function in her daily life.

The Court, consequently, **GRANTS** Defendants' Motion as to Plaintiffs' claim of intentional infliction of emotional distress against Defendant Apley.

**D. Respondeat Superior Claim**

Because the Court concluded that Plaintiffs have not presented genuine issues of material fact regarding either their assault or intentional infliction of emotional distress claims, Defendant Millennium School, likewise, cannot be liable for these two claims under the theory of respondeat superior. Therefore, it is unnecessary for the Court to consider whether Defendant Millennium School is immune from liability pursuant to Chapter 2744.

**V. CONCLUSION**

Based on the foregoing analysis, Defendants' Motion is **GRANTED** as to Plaintiffs' assault and intentional infliction of emotion distress claims against Defendant Apley and as to Plaintiffs' respondeat superior claim against Defendant Millennium School. However, Defendants' Motion regarding Plaintiffs' claim under 42 U.S.C. § 1983 and the Fourth Amendment is **DENIED.**

**IT IS SO ORDERED.**